

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7139 | **DATE** | 9/11/2001 |
| **CASE TITLE** | City of Country Club Hills vs. United States Department of Housing | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: HUD's Motion for Summary Judgment is granted. The City's enforcement of its building ordinances against HUD and its contract property manager is barred by the Supremacy Clause. The City is therefore permanently enjoined from seeking to cite, fine, or penalize HUD or its employees, agents, or contractors, when they are carrying out their duties derived from the National Housing Act and all regulations promulgated thereunder or taking any other action inconsistent with this order.
(11) ■ [For further detail see order attached to the original minute order.]

|   | No notices required, advised in open court. | | 3 | Document Number |
|---|---|---|---|---|
|   | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 17 2001 | |
|   | Notified counsel by telephone. | | date docketed | 64 |
|   | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | FILED FOR DOCKETING | docketing deputy initials | |
|   | Copy to judge/magistrate judge. | 01 SEP 14 PM 5:55 | 9/10/2001 date mailed notice | |
| WAP | courtroom deputy's initials | Date/time received in central Clerk's Office | WAP mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

F I L E D

SEP 1 1 2001

Judge Harry D. Leinenweber
U. S. District Court

CITY OF COUNTRY CLUB HILLS,
a municipal corporation,

    Plaintiff,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT;
GOLDEN FEATHER REALTY SERVICES,
INC.,

    Defendants.

99 C 7139
Judge Harry D. Leinenweber

DOCKETED
SEP 17 2001

## MEMORANDUM OPINION AND ORDER

    The City of Country Club Hills (the "City") finds the United States Department of Housing and Urban Development ("HUD") to be a neglectful and absentee landlord with respect to its vacant single family homes within the town. The City issued more than 161 citations against HUD properties, claiming that the properties failed to comply with the City building code. HUD removed the case to federal court, counterclaiming that the City's actions violate the Supremacy Clause of the United States Constitution and seeking permanent injunctive relief. The citations were previously dismissed with prejudice, leaving only HUD's counterclaim. HUD's motion for summary judgment on the remaining counterclaim is now before the Court.

64

**BACKGROUND**

As a preliminary matter, the Court notes that the City failed to provide record support for several statements in its Local Rule 56.1 Statement of Additional Facts. The Court therefore disregards them. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997)(refusing to consider the plaintiff's additional facts where not supported by specific references to the record). In addition, other paragraphs contained legal argument or conclusions of law that have no place in a statement of facts. L.R. 56.1(b)(3)(B). Accordingly, paragraphs 5, 6, 8, 10-12, 15-17, 20, 21, 26, and 34 are stricken. The material, undisputed facts are summarized below.

As part of its mandate to provide affordable housing to all Americans, HUD insures mortgages on single family homes through the Single Family Mortgage Insurance Program (the "Insurance Program"), set forth in 24 C.F.R. pt. 203 (2001). This insurance is commonly known as FHA insurance. If a mortgagor defaults on a HUD-insured mortgage, the mortgagee may foreclose and convey title of the property to HUD. The mortgagee then submits an insurance claim to HUD for payment of most of the mortgagee's losses, and HUD disposes of the property according to its procedures.

Disposal of such acquired property is governed by the Single Family Property Disposition Program (the "Disposition Program"). *See* 24 C.F.R. pt. 291 (2001). The implementing regulations and HUD

Handbook 4310.5 REV-2 (1994) identify the procedures followed in disposing of such property. The Disposition Program's purpose is to reduce the inventory of acquired properties "in a manner that expands home ownership opportunities, strengthens neighborhoods and communities, and ensures a maximum return to the mortgage insurance fund." 24 C.F.R. § 291.1(a)(2)(2001).

Prior to conveying the properties to HUD, the mortgagees are responsible for preserving and protecting them. After conveyance, the properties become the responsibility of HUD's Real Estate Owned Division. HUD does not manage the properties directly, however. Instead, HUD contracts with a so-called M & M contractor which manages and markets the properties while in HUD's inventory. The M & M contractors are responsible for both the preservation and sale of the properties.

HUD's M & M contractor for Northern Illinois is Golden Feather Realty Services, Inc. One of Golden Feather's duties is to inspect the properties and eliminate any imminent hazards. Golden Feather must preserve and protect all vacant HUD-owned properties by removing debris, boarding-up the properties, and neutralizing any hazards within a 24-hour period. Nevertheless, HUD regulations provide that the properties are sold on an "as-is" basis, without repairs or warranties. 24 C.F.R. § 291.100(c)(2001).

Country Club Hills is a southwest suburb of Chicago. The City aggressively enforces a property maintenance program, inspecting

thousands of homes and taking hundreds of violators to court over the last three years. During 1999, there were between 100 and 200 vacant homes in the City, and it inspected all of these homes during the summer of 1999. The City enforces its building code ordinances against all properties within it, not just those owned by HUD.

The undisputed evidence makes clear that Dwight Welch, the City's mayor, was particularly unhappy with the deteriorating HUD properties within City limits. Welch criticizes HUD for allowing the properties to deteriorate, creating health and safety concerns and negatively affecting neighboring property values. One such HUD property has approximately 12-15 code violations. Despite being issued several citations, the violations have not been corrected. Another purportedly HUD-owned vacant property has holes through which vermin, rain, and snow can pass, and its deck is falling down.

During July and August 1999, Welch launched an offensive designed to draw attention to the HUD properties. He met with his city manager and members of his building inspection department, chastised the staff for allowing several of the vacant homes in town to reach their current state of deterioration, and told them to conduct inspections and issue citations for building code violations. He also expressed his dissatisfaction with HUD's management to a local newspaper, stating that he was "fighting mad"

and calling the federal government "the biggest slumlord we have." Welch confirmed to the newspaper that inspectors were told to check all vacant homes in the City by August 14, 1999, and he also promised to present the citations in state court on August 24, 1999. In the article, Welch indicated that HUD's practices resulted in lower property values, and despite his lack of authority to do so, he even threatened to arrest the Secretary of Housing and Urban Development for the code violations if the Secretary ever visited. The City also produced a video entitled "HUD, the Unwanted Neighbor," showing numerous vacant city homes claimed to be owned by HUD.

In August 1999, the City issued 75 citations against the contractor managing the HUD single family properties for alleged violations of the building code (the "August citations"). A state court awarded the City $36,500 in fines which were then recorded as judgment liens on the respective properties. Welch met with HUD officials and warned them that the City would continue to issue mass citations against HUD or its property managers every month. He also threatened that even if HUD properties came into compliance with the City's local ordinances, he would only agree to continuances of the citations in state court.

The City also submitted an application on August 24, 1999, to HUD's contractor seeking certification of not-for-profit status from HUD. The not-for-profit status would allow the City to

purchase local family homes from HUD at significant discounts and receive HUD-subsidized home-improvement loans. The application included a narrative stating that "low and moderate income families benefit from the City of Country Club Hill program by . . . purchasing a home below fair market value." Although a September 30, 1999, newspaper interview indicated that Welch wanted HUD to turn over management of the single family homes to the City, he testified at his deposition that the City did not wish to manage such homes.

On September 27, 1999, the City passed an ordinance requiring that all residential property managers and their subcontractors pay an annual $1,000 licensing fee. The ordinance preamble specifically names the United States Government and HUD as members of the class to be regulated under the ordinance. HUD points out that the ordinance does not likewise single out real estate brokers or firms, although the Court notes that such groups would be included under the broad ordinance definition of "property managers." Since enactment of the ordinance, the City has forced at least one contractor working for Golden Feather to leave a home repair job in the City because it did not have the required license.

From October 18, 1999 through October 21, 1999, City inspectors issued approximately 161 citations against 27 vacant properties purportedly owned by HUD (the "October citations").

Several of the October citations applied to violations previously cited in August. HUD characterizes the alleged violations as "cosmetic" or "cryptic," and lists several examples: "window and door frames need painting," "paint hand rails," "repair mailbox," "place address on house," "exterior maintenance code violation," and "exterior painting violation." Although the City protests that no one could be arrested for violating the City building code, copies of the tickets kept by the City admonished HUD and Golden Feather that failure to pay the penalty could result in the issuance of an arrest warrant.

On November 2, 1999, the U.S. Attorney for the Northern District of Illinois removed the citations to federal court, staying further state court proceedings. The City voluntarily dismissed all of the October 1999 citations, purportedly because all of the cited properties came into compliance with the City's code.

In its defense, the City states that it enforces the building code against all residences, not just HUD properties. The City denies that Welch's statements to the newspapers related to the City's issuance of tickets and indicates that the citations were issued solely because of code violations. The City also claims that it has adopted procedures designed only to obtain code compliance and facilitate HUD's transfer of vacant HUD homes.

HUD complains that, as a result of the City's efforts, no HUD properties in the City were sold between July 20, 1999, and December 3, 1999, after the citations had been removed and stayed by the district court. The City avers that it has never held up the sale of a HUD-owned vacant single family home because of code violations and points out that HUD fails to identify any sales actually hindered during that period.

HUD seeks declaratory judgment that the City's efforts violate the Supremacy Clause of the United States Constitution and a permanent injunction prohibiting further City enforcement of its building code against the HUD-held vacant single family homes. The City responds that Congress could not have intended to allow poorly maintained HUD properties to become a blight on the communities in which they are located. Their respective arguments are examined below.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment is appropriate if, on the record as a whole, a rational trier of fact

could not find for the non-moving party. *Wolf v. N.W. Ind. Symphony Soc.*, 250 F.3d 1136, 1141 (7th Cir. 2001).

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *U.S. Const., Art. VI, Cl. 2.* State and local law may run afoul of the Supremacy Clause by one of two ways: (1) the law may conflict with and therefore be preempted by congressional command or (2) the law may directly regulate or discriminate against the federal government in violation of the intergovernmental immunity doctrine. *North Dakota v. U.S.*, 495 U.S. 423, 434 (1990).

HUD contends that the National Housing Act (the "NHA") and subsequent regulations preempt the City's building code. The City responds with several arguments. First, the City asserts that HUD is not authorized to promulgate regulations preempting local building codes. Second, the City maintains that HUD's regulations do not conflict with state law. Third, the City argues that compliance with the building code will not conflict with HUD's federally mandated purposes. Fourth, the City states that HUD offers no proof that compliance with the building code would frustrate its efforts.

Under the Supremacy Clause, Congress may preempt state or local law expressly or implicitly. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 371-72 (2000). Congress implicitly preempts state law when Congress intends federal law to "occupy the field," or if Congress has not occupied the field, state law is preempted to the extent of any conflict with a federal statute. *Id.* (citations omitted).

As Congress has not expressly preempted state law in this case, the City's building code will be preempted if, "under the circumstances[,] . . . the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 373 (citations and brackets omitted). Implicit preemption can be effected either directly by Congressional acts or indirectly by federal agencies acting within the scope of their congressionally delegated authority, thereby rendering unenforceable state or local laws that are otherwise consistent with federal law. *City of New York v. F.C.C.*, 486 U.S. 57, 63-64 (1988).

With passage of the NHA, Congress declared its hope to provide "a decent home and a suitable living environment for every American Family." 12 U.S.C. § 1701(t). The NHA provides:

> Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, the Secretary shall have power to deal with, complete, rent, renovate, modernize, insure, or sell for cash or credit, in his

> discretion, any properties conveyed to him in exchange for debentures and certificates of claim as provided in this section. . . . The Secretary shall, by regulation, carry out a program of sales of such properties and shall develop and implement appropriate credit terms and standards to be used in carrying out the program. . . . The Secretary may sell real and personal property acquired by the Secretary pursuant to the provisions of this chapter on such terms and conditions as the Secretary may prescribe.

12 U.S.C. § 1710(g). Thus, the NHA confers broad discretion to the Secretary when deciding if HUD-held homes should be repaired and the extent of any such repairs. To this end, the Secretary has promulgated regulations setting forth HUD's policy on repairs to homes held under the Single Family Disposition Program.

Prior to the mid-1970's, HUD made extensive repairs to the properties before selling them, but vandalism, contractor fraud, and a desire to allow purchasers to renovate the properties as they wished, convinced HUD to forego such renovations. *Single Family Property Disposition Program*, 56 Fed. Reg. 13997 (1991)(notice of proposed rule to be codified at 24 C.F.R. pt. 291). As a result, HUD adopted its "as-is" policy: in order to return acquired property to the market as quickly as possible, properties are sold on an "as-is" basis, without repairs or warranties. *See* 24 C.F.R. § 291.205; 24 C.F.R. § 291.100(c)(2)-(3).

The "as-is" policy reflects HUD's decision to reduce the number of acquired properties "in a manner that expands home

ownership opportunities, strengthens neighborhoods and communities, and ensures a maximum return to the mortgage insurance fund." *HUD Handbook 4310.5 REV-2 (1994)*. In adopting the "as-is" policy, HUD explained that the "problems with making repairs are legitimate concerns that outweigh any benefits of completing extensive repairs before sale." *Single Family Property Disposition Program*, 56 Fed. Reg. 46965 (1991)(notice and discussion amending regulations codified at 24 C.F.R. Part 291). HUD asserts that it adopted this policy because it allows properties to be sold more quickly, helping to preserve and stabilize neighborhoods and communities.

The NHA confers broad discretionary authority on the Secretary to carry out his duties. This wide latitude extends to HUD's decision to sell the property "as-is," thereby maximizing the return to the insurance fund. The City's publicity campaign regarding HUD's failure to maintain the properties and its citations for code violations impermissibly frustrate HUD's policy of returning the properties to the market as quickly and cheaply as possible. Forcing HUD to make repairs removes the discretion clearly vested in the Secretary by the NHA. The choice forced upon HUD to either make the repairs or incur further citations that will result in judgment liens on the properties interferes with HUD's goals by imposing unwarranted costs to HUD and potential buyers. Although it is unclear whether the October citations and negative publicity generated by the City actually affected sales, it can be

assumed that continued action by the City will negatively affect future sales. The increased costs imposed on HUD by further enforcement of the City's building code cannot continue to "stand[] as an obstacle to the accomplishment and execution" of HUD's policies. *Crosby*, 530 U.S. at 373.

The City complains that allowing HUD to ignore the building code will depress property values and blight the community with ramshackle homes. Indeed, HUD's policies for administering a residential mortgage insurance program in a cost-effective way and the City's legitimate concern in regulating the health and safety of its neighborhoods create an unfortunate tension between local and federal interests. Nevertheless, an "agency may determine that its authority is exclusive and preempt[] any state efforts to regulate in the forbidden area." *City of New York v. F.C.C.*, 486 U.S. 57, 64 (1988). "[I]f the agency's choice to pre-empt represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* In this case, the court cannot say that HUD's "as-is" policy does not reasonably accommodate the overall federal policy of addressing the needs of buyers and lenders in the low-income housing market. Accordingly, those portions of the City's housing code requiring HUD to vacate, repair, or remove the

property in question are preempted by the NHA and its implementing regulations.

The City's actions also violate principles regarding the boundaries between state and federal power as set forth long ago in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). "[T]he states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is . . . the unavoidable consequence of that supremacy which the constitution has declared." *Id.* at 436.

The City's building code as applied to HUD and its properties impedes, burdens, and interferes with the operation of constitutional federal law. The impact is not incidental; as detailed above, it is impermissibly intrusive as to HUD. The Court finds unconvincing the City's argument that it is not directly regulating the federal government by virtue of the fact that it is issuing citations to HUD's M & M contractor. The City is attempting to regulate the property itself, the owner of which is HUD. It is immaterial whether the City cites HUD or its agent when attempting to impose its will; the effect is the same in either case. Such a burden cannot be imposed upon a federal agency attempting to execute a function of government. *See Mayo v. United States*, 319 U.S. 411, 447 (1943). Two recent cases support this conclusion. In *United States v. City of St. Paul*, 258 F.3d 750

(8th Cir. 2001), the court refused to allow St. Paul to enforce its nuisance code against HUD properties acquired under the Insurance Program (noting that "HUD must be allowed to carry out its federal functions in a relatively uniform fashion. [It] cannot be subjected to a vast multitude of municipal ordinances throughout the United States. . . ."). The court in *City of Des Moines v. Secretary of Housing and Urban Development*, No. 4-99-CV-90625 (S.D. Iowa Sept. 22, 2000) similarly held that the Supremacy Clause prohibits Des Moines from forcing HUD to abide by its housing code for HUD properties acquired under the Insurance Program.

## CONCLUSION

For the foregoing reasons, HUD's Motion for Summary Judgment is granted. The City's enforcement of its building ordinances against HUD and its contract property manager is barred by the Supremacy Clause. The City is therefore permanently enjoined from seeking to cite, fine, or penalize HUD or its employees, agents, or contractors, when they are carrying out their duties derived from the National Housing Act and all regulations promulgated thereunder or taking any other action inconsistent with this Order.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: September 11, 2001